We'll turn to the next case, Abdelal v. Police Commissioner Mr. Leibovitz, and is Ms. Gottlieb on the line? Yes, I'm here. Yes. Alright. Mr. Leibovitz, you can proceed. Thank you, and may it please the Court, David Leibovitz for Plaintiff Appellant Mohamed Abdelal. The District Court's grant of summary judgment in this case should be reversed because a reasonable jury could find that if Mohamed Abdelal from Egypt were instead Michael Anderson from Australia, and was found to have improperly attempted to visit an Australian fraudster in immigration detention to help out an Australian friend of his, defendants would not have subjected him to an intrusive four-year internal probe, investigated him as a potential terrorist, and fired him from the NYPD, just as all the most relevant comparator officers did not endure such treatment. On this record, a reasonable jury could believe he suffered that fate because he is an Arab-American Egyptian-born Muslim. The District Court here incorrectly found that Mr. Abdelal failed to make out a prima facie case. That's a burden that this Court has received. When you say he attempted to help a friend, he used his credentials and lied to immigration officials so that he could gain access to someone, right? He did not admit to that. It's a disputed question of fact whether he ever made the statement that was attributed to him that he was from Interpol. That's something that one of the correction officers testified about and was contradicted by his own partner. But you don't dispute that he committed misconduct, that he committed violations? We don't dispute, and in fact he pleaded guilty to several of the specifications that he was charged with, including making this inmate visit without proper authorization. But again, it's very important I think to recall here that the question in this case is not whether the NYPD was justified in imposing discipline on him. It's not even whether in the abstract someone could think it was reasonable to fire him. The question is whether the consequences he suffered would have been less harsh, but for his protected characteristics. Are there any examples in the record of an Australian or someone else who was not Egyptian who engaged in similar conduct, who was not treated as harshly? Absolutely, Your Honor. So I think the comparator evidence is really the heart of this appeal, and I want to start with the comparators who are conceitedly outside of Mr. Abdullah's protected categories, beginning with Stephen B., who it's undisputed was a white American-born Catholic. That's at page 1601 of the record. This is someone who visited an incarcerated criminal 46 times without authorization. He was ordered to stop by his supervisor. He disobeyed that instruction. He kept going. He was involved in five domestic disputes with the same person, all of which required police response. He concealed all of that from the NYPD. Now, defendant's position is that this is, as a matter of law, dissimilar misconduct, and the principal reason they give for this is because it didn't involve dishonesty or deception. But in fact, I think it's important here that Stephen B. was charged under the same patrol guide section as Mr. Abdullah, and as this court has said many times, the relevant consideration when considering whether a comparator is sufficiently similar is whether they're subject to the same workplace standards. You know, it seems to me that you harm your case by the emphasis you give to the comparator evidence, because to make a case of discrimination that can go to the fact finder and is not subject to summary judgment, all one needs to do is have sufficient evidence that would make it reasonable for a fact finder to conclude that there was discrimination. And it seems to me that there's plenty of that evidence here, but you harm your case by harping on the comparator evidence, which you claim helps your case. It really doesn't, because your comparators are not great comparators for you. The nature of the offense of going to visit a girlfriend in prison a bunch of times is very different from what happened in your case, or at least arguably so. And the more you put emphasis on the justification for your comparator evidence, it seems to me the weaker your case seems to be. Whereas if you put the focus on simply whether there is evidence in the case that could reasonably support a fact finder in finding that the fact that he was Egyptian, or Arab, or Muslim, or whatever, influenced the police in the amount of discipline enforced, the case then looks very different. A few responses, Your Honor. First of all, I, of course, completely agree with you that the record is replete with other evidence aside from the comparators that is sufficient to set out a crime-official case of discrimination here. We have, in the first instance, direct evidence, which is, as Your Honors are, I'm sure, well aware, extremely rare in these types of employment discrimination cases, where we have the decision-maker, the supervisor from the IAB investigation, testifying that the fact Mr. Abdullah was from the Middle East was on her mind when she decided to approach the investigation the way she did, including by treating it as a terrorism inquiry, calling the Joint Terrorism Task Force. And the District Court completely failed to consider that statement. Defendants' response to it is that, well, they would prefer to credit her testimony that she would have done the same thing anyway, even if you were of a different nationality. That's a paradigmatic jury question that should never have been resolved on summary judgment. We also have Commissioner Kelly testifying in his deposition that the Joint Terrorism Task Force was consulted because of the nexus with Egypt. Again, an explicit connection between his treatment and his national origin. And this Court teaches in its Henry decision and others that these statements... Where's the connection? I mean, you know, he was of Egyptian background. There was a lot of questions initially which were resolved that he was not in any way a threat to the country. But initially, you know, one would expect that they would conduct some kind of investigation just to rule that out quickly, which they did. And then the other question I have is, can you address the whole question of the legitimate nondiscriminatory reason that ultimately would prevail here, it seems, which is the fact that he had been disciplined. He had pled guilty to seven counts, found guilty on two more, was acquitted on two, and then was sanctioned based upon that conduct as being the reason for whatever action was taken against him. First by the commissioners and by the, I guess, the committee, and then eventually by the commissioner himself. Of course, Your Honor, I'd be happy to address those points in turn. As to Your Honor's first question about, you know, with the connection between the way the investigation was conducted and whether these terrorism-related inquiries were legitimate at some early point, I think the record is clear that they were not. There was no allegation ever of any association between anyone involved and any terrorists or any sort of terrorist plot, anything like that. And the IAB investigation here, remember, the corruption charge was downgraded in the IAB file on July 22, 2008, after this exhaustive search for any associations between Mr. Gaddou and Mr. Abdelal. Six months later, in January 2009, the record shows IAB is contacting DHS to get information about his travel, about his family history. They're running his sister and his mother through terrorist databases and watch lists. They're contacting the intelligence division. They're looking at their financial records. And, you know, the very fact that the Joint Terrorism Task Force was contacted at all, there's no coherent explanation provided for that. Lieutenant Fabregas first says it's because of the magnitude of the fraud, then she admits she only found out about that afterwards. Kelly testifies that it's actually because of the nexus to Egypt, which, of course, is direct testimony that national origin played a role. So I do think that even if the district court found, which of course we disagree with, that the monitoring and the investigation could not independently support a freestanding adverse action, there's certainly circumstantial evidence of improper purpose because of the way defendants deviated from ordinary and justified procedures. And that's true. The question is not at all whether the police department was justified in exacting the extent of discipline that they did, as opposed to some lesser extent. The question is whether there is enough evidence to raise a jury question of being influenced by national origin. Exactly right, Your Honor. And in fact, in this case, NYPD prosecutors and the hearing officers both recommended penalties short of termination. And Commissioner Kelly, who in every other case, was always the one either accepting the recommendation or downgrading the penalty recommended by the hearing officer. This is the one case in which he said, I reject all of the people's suggestions who are closest to the record here who have studied this and heard the testimony, and I'm going to insist that he be fired. And that was, as the record shows in this case, I think very irregular for him. The entity that preceded Commissioner Kelly's decision said he should be fired, but it should be deferred. Is that right? Yes, and I think the record makes clear that that is a relatively common non-termination sanction that the NYPD imposes. And what it really amounts to is essentially a probationary period where in name you are terminated, but it's suspended pending a one-year or whatever probationary period. But that's considered to be very much distinct from actually being separated from the department. What it really is, is essentially a certain amount of time where if you get in trouble again, you'll be fired. And that's what was recommended by the departmental prosecutors here and the hearing officer, and Kelly was the one who stepped in and said, you know, that's not good enough. The only other person who was subjected to, you know... Well, if Kelly had adhered to that recommendation, then you wouldn't be here, presumably. Is the difference between that recommendation and what Kelly did that is causing you to press this case, is that right? Well, certainly the reason my client brought a lawsuit is because he was fired. I mean, we certainly do think that the pre-termination conduct was discriminatory, but yes, obviously the firing is the starkest example of a material adverse consequence of that discrimination. And if you look at some of the other comparators... What evidence do you have directly that Kelly was aware of and was himself discriminating? Because he was the one who actually imposed the sanction of firing. Yes, well... As opposed to other things that may have gone on, you know, in terms of the length of the investigation and other factors that you pointed to. Yes. Kelly's awareness of this. Yes. Kelly... The testimony that was clearly in the record before the district court is that Commissioner Kelly received the prosecutor's factual summaries of the case. He received the hearing officer's summary of the testimony. All of those documents in this case clearly were replete with references to Mr. Abdelal being Egyptian, to Mr. Gaddo being Egyptian, to the fact that these terrorism inquiries were conducted. That was a subject that was covered in quite extensive detail during the disciplinary trial. And I don't think there's any dispute that all of the information from that proceeding and the recommendations of the prosecutors, which contain, as you'll see in the memos from the PCO at page 110 of the record and elsewhere, there are these editor's notes that say, you know, by the way, we consulted with the Joint Terrorism Task Force and the Department of Homeland Security. We searched to see if he had links with the Egyptian government. Yes, and Kelly testified, right? He did testify. Was he presented with this evidence at his testimony? Did he testify to his knowledge of all of these situations that you're referring to? Or are we required to make inferences on that? I believe he did, and I would be happy to check the record before my rebuttal, but I believe he did testify that he reviewed, and it was his common practice to review the summaries that were provided before he made these kinds of determinations. Reviewing summaries may be different from reviewing the whole trial testimony. Correct. You a moment ago mentioned, just a little bit prior to Judge Walker's question, you said something about Judge Kelly having stated something, which you didn't mention in answer to Judge Walker. What was that that you mentioned a few minutes ago? Not just of stuff that was shown or that was presented to the commissioner, but something that he said? Well, he did say in his deposition that the reason that, for example, the Joint Terrorism Task Force would have been contacted in this case was because of Mr. Abdullah's nexus to Egypt. He also testified when speaking, for example, about the Level 2 performance monitoring, that that would typically be resolved for people who had committed serious criminal misconduct evincing moral turpitude. In fact, as we know, in this case, unlike in Stephen B.'s case, where the criminal association allegation was substantiated, in this case it was unsubstantiated. There was no dispute that there was insufficient evidence to bring criminal charges, which was not the case, for example, with the comparator Jose T., who was guilty of mortgage fraud.  clearly undertake conduct that was, and were charged, in fact, under the same patrol guide for undertaking conduct prejudicial to the NYPD. You have some time for rebuttal. Let's hear from the city, and then we'll come back to you. Good morning. May it please the Court. Anna Gottlieb for Appellees. This Court should affirm. The case concerns a former NYPD officer who was found guilty at an administrative trial of falsely representing to other law enforcement agents that he was part of an official Interpol investigation demonstrating an abuse of power conferred upon him as an officer. After he declined to leave the force with vested retirement benefits, he was terminated upon the recommendation of a panel. The district court properly dismissed claims of disparate treatment under each standard, most simply because appellant cannot show an inference of discrimination or that he was treated less well than others similarly situated on these facts. But that's not the issue in a discrimination case. I mean, it can be one way of demonstrating discrimination, but it doesn't have to be. It doesn't have to be true that people can be victims of discrimination without there being disparate treatment comparing them to any other person with the claim that their conduct was similar. The question is whether the evidence could reasonably support a fact-finder's finding that there was discrimination, either in the fact of discipline or in the extent of discipline. And I don't see why that isn't true here. Sure, and I'd be happy to address each of the pieces of evidence on which appellant relies because none of them rise to an inference of discrimination. There are really four pieces of evidence or four facts on which appellant relies. Two have to do with the administrative trial itself. One was a comment made by the investigator that this was the – or a notation, excuse me, in the record that this was the Egyptian case. That's simply a fact of the case here. The IAB was initially called because appellant went to an out-of-state detention facility where he tried to see a detainee who is from Egypt. He was being held on for immigration issues. And the IAB investigation was initiated to investigate whether there was a criminal association between these two individuals. Mr. Abdull was also – So what about the fact that where there was unquestionably an instance of misconduct by a New York police officer, that launched a terrorism investigation? This was never a terrorism investigation, and I'd like to address my adversary's points on this. The investigator's testimony here was clear during the administrative trial that the Joint Terrorism Task Force was only contacted, and that line of inquiry was only followed because of Mr. Gaddu, who was the detainee who Mr. Abdull was seeking to see, because he was alleged to have been involved in a $30 million fraud scheme. And with that amount of money, that would require the consultation of the terrorism task force. If you review the 1,000-page IAB record here, there are only two mentions of terrorism at any point. They are running through the terrorist databases, which again by this investigator's testimony was routine in this type of investigation. But if a police officer did a really serious piece of misconduct, like keeping and selling the drugs that he seized from a drug dealer, or stealing from a place where there had been a fire and the police show up, something like that, one can expect that they would not do any terrorism investigation, because there would just be no reason to. Misconduct doesn't meet any connection to terrorism. And you have some explanation. Well, it was because of this or because of that, and it was only two brief mentions. Why is that not evidence that his national origin and his religion, possibly as either one of the two, were influencing the police department? I've never seen a case with this amount of evidence where summary judgment would be affirmed, because this is real evidence. It may be discredited. Maybe you should win at the end. There's no question he committed misconduct. But why isn't that perfectly decent evidence on which a fact finder could reasonably find discrimination? So two answers to that, Your Honor. First, while we may sit here and speculate that this might not be done in cases involving drugs, we actually don't have that. Appellant did not bring forward that evidence. You don't need evidence if it seems abnormal, if it doesn't seem like the call for a response to investigate terrorism just because an officer has committed some misconduct, has misused his credentials, for example, saying, I'm here on official business when it wasn't true. What we do have in this record is a legitimate reason why the Joint Task Force was briefly contacted during this investigation, and that was the testimony of... But that doesn't dispute it. The fact that there's a legitimate reason, that's something that you argue to the jury. But the point is that there's no evidence contradicting that, so there's no other evidence for the jury from which to extrapolate that this wasn't a reasonable line of inquiry other than the speculation brought forward by the appellant. I mean, he doesn't show that this was outside of regular IAB procedures or that this is not done in other cases. All we have is the investigator's testimony that this was done here and it was done for this legitimate reason. So for that reason, there actually isn't enough here to go to the jury on that point. You had other points that you were talking about. The trial and also the investigation itself. Were there other points that you were making? You remember you started off saying there were four points that the appellant was making. Yes. So the first one that we just raised was the fact that this case at some point was noted by one of the investigators as the Egyptian case. Again, that is really just a factual summary of the fact that this was an inquiry into a criminal association with an immigration detainee from Egypt. The second point was that the investigator noted that this case or that Mr. Abdullah's Middle Eastern descent was in the back of her mind. Again, she unequivocally testified that the same lines of inquiry would have been run regardless of this. I would like to point out that seven of these charges are charges that Mr. Abdullah pleaded guilty to. Two more were determined at the end of a full administrative hearing. That hearing was challenged in an Article 70 proceeding. It was upheld by the Article 70 process in the First Department. So there is no question about bias in the hearing. Those charges stand. They are legitimate reasons for why the NYPD determined to discipline Mr. Abdullah here. At one point, Counselor, you made a statement that he was terminated on the recommendation of the panel. That's not quite accurate, is it? I mean, he was terminated flat out by Commissioner Kelly. They put him on a probation period. So there are a few levels of review here. So while after the administrative trial, the suggested penalty wasn't a full-out separation from the force, then the penalty, which Commissioner Kelly is the decision-maker here, but actually the decision he made here first went to something called the Police Commissioners Committee. And this is a panel made up of three high-level individuals on the NYPD. And they are actually the ones who recommended that this conduct was serious enough to warrant separation from the force. So, again, they put in front of Commissioner Kelly a plea deal, which was— That was a recommendation of full separation without the— It was a full separation, but with vested retirement benefits. So it would have allowed Mr. Abdullah to terminate from the force then with benefits. But he rejected that plea deal. And then, again, the recommendation from this three-member panel said, if he does not accept this deal, then he will be terminated from the force. And that terminated subject to a period of time of probation, in which case perhaps his behavior would be such that the termination could be revoked before it was actually put into place. So the probationary dismissal, the dismissal with the probationary period, that was something that was recommended after the trial by the Deputy Commissioner of Trials. And that was a suggested penalty. That penalty then goes in front of the Police Commissioners Committee, which is separate from the adjudicative process at the NYPD. And this is—these are individuals who work under the Commissioner, and then they make a recommendation to Commissioner Kelly, which he then accepted in this point. So it's not fair to say that Commissioner Kelly was unilaterally making decisions here because he was acting upon this recommendation. And I would just like to point out that in the record—I see that I'm running out of time, but there is an instance, for instance, where Commissioner Kelly downgraded a suggested penalty for another officer of a Muslim background. So, again, there is not enough in this record to take these facts to a jury. Thank you. We'll hear the rebuttal. Thank you, Your Honor. I'd just like to address a few quick points. The first is on the supposedly distinguishing number of charges he faced. The hearing officer in Mr. Abdelal's trial expressly found that these other charges would not have been sufficient, quote, even in combination, to justify termination. So I think it's telling that defendants want to say that Mr. Abdelal's firing was neutral because it relied on this hearing officer's findings on these credibility determinations and the findings of guilt. But yet there's no explanation for why, if Kelly was just completely neutrally relying on what the hearing officer said, why he deviated from the recommended penalty. Again, an unexplained procedural irregularity here. On the point of the three-person committee recommendation, I just wanted to point out, you can see at page 115 of the joint appendix that Commissioner Kelly had already rejected at this point, I think actually two years earlier, a negotiated pretrial settlement and insisted upon complete separation. So I think a jury could clearly surmise that he was the one who really was insisting on firing here long before he received anyone else's recommendation. Well, does it really matter whether it's the Commissioner himself or the committee that operates under him? I mean, the liability doesn't turn on whether Commissioner Kelly himself was acting in a discriminatory fashion. That's true to the extent that, for example, the Title VII claim is against the employer and not against an individual. I do think the fact that Commissioner Kelly is the one who has these direct statements on this pattern evidence. Yes, that helps, but the Commissioner's statements, to the extent that they were publicized, they could be presumed to influence those who operate under Commissioner Kelly. And while evidence of Commissioner Kelly's discrimination may be helpful to your case, it's not essential to your case. That's true, Your Honor. The last point I would just make is that several of the other comparators were charged under the same patrol guide section about conduct prejudicial to good order. That includes Jasmine P., who ran an unauthorized search of NYPD computers to find information about her brother, who is being investigated. I think it's hard to imagine a clearer abuse of position. She was charged under the same subparagraph. Same with Sharon F., who conducted unauthorized computer searches. Jose T. committed mortgage fraud by misrepresenting his NYPD income on a mortgage application. Donald T. forged departmental paperwork. All of these people were, just like Mr. Abdullal, accused of abusing their position in a dishonest way. None of them was fired. They also all conducted many unauthorized inmate visits. And it's ultimately for a jury, as this Court has said many times, to make the final determination of whether these comparators are sufficiently similarly situated for their treatment to be material to the disparate treatment inquiry. That's not a finding that the District Court was entitled to make as a matter of law, as this Court has repeatedly held. So we would urge the Court to reverse. Okay, I have one further question. There is a hostile work environment claim, I understand, still in the case. Is that right? Yes, Your Honor. And it does seem to me that, independently of the discrimination, the regular discrimination claim, the hostile work environment claim is rather weak on your side because, for a long period of time, your client wasn't even aware of the investigation. He wasn't aware of all of these things. And the normal hostile work environment is where he goes to work every day, and people are badgering him because he's a Muslim or because he's Egyptian or something of that sort, and he can't get his job done, and it's pervasive. And I don't sense that. This doesn't seem to be that kind of a case. Well, it may not be the typical hostile work environment case, Your Honor, but I think particularly focusing on the New York City human rights claim, which doesn't require severe and pervasive harassment. It only requires non-trivial differences in treatment. That's a separate analysis that the District Court was required to conduct, in which defendants effectively concede it did not. Their alternative basis for affirming is, as Your Honor suggested, that he wasn't subjectively aware of the discriminatory conduct, but I just think that's simply not true. Mr. Abdullal was interviewed as part of the IAB investigation in 2009. He testified that it left him with a distinct impression that the investigation was especially intensive. The phrase especially arduous was used. That's at page 1308 of the record. That was an investigation into these disciplinary infractions, some of which he pled guilty to and some of which he was convicted on, right? And so he's complaining and saying that because there was this investigation and they were careful and exhausted in this investigation, that that somehow is a hostile work environment. That can't be right. I don't think that that's exactly the claim, Your Honor, respectfully. I think what the claim is is that these investigations and monitoring went so far outside the bounds of anything that could conceivably have been rationally related to what he was charged with, particularly when they were still investigating supposed terrorist ties of his sister and parents six months after they had downgraded their own investigation away from the criminal association and taken away the corruption designation. It's, I think, very hard to say. What was he aware of, though? The extent to which investigations are usually quite secret until you talk to the suspect. And you have to discount everything that happened before he knew there was an investigation, right? That can't be part of the hostile work environment. Well, it can be evidence of discriminatory intent. It can't be evidence of his subjective reaction to it. But I think it's undisputed here that he learned of the fact that this extremely burdensome and intrusive investigation was occurring four years before he ceased to be an employee of the NYPD. So he's working there for years, including, by the way, while the disciplinary trial is going on. That's two years before he's fired. And everybody who is subject to a disciplinary trial for successive violations can't be arguing a hostile work environment based upon that. It seems to me, unless there's, you know, right? Without undermining the whole disciplinary structure. It's certainly true that not everyone who's subjected to a disciplinary proceeding can argue that it per se creates a hostile work environment. But if they can show that it's unusually intrusive and that they were treated differently because of their national origin, as we submit a jury could reasonably find here, at least under the New York City Human Rights Law, that is a difference in treatment that would give rise to a discrimination claim. So, for example, if the jury found here that IAB would not have conducted their investigation for as long, they wouldn't have made the same terrorism inquiries, they wouldn't have, you know, done the same kind of investigation that they did here, if Mr. Abdullah were not Egyptian, which is a fact that essentially the investigator and Commissioner Kelly conceded, that would be a difference in treatment explained because of national origin, which the New York City Human Rights Law... You're saying that he became aware of the fact of the investigations of his family and his sister and so on for terrorism, and that he had a considerable part of his years of police service while being aware that those investigations had been conducted. Is that correct? Yes, Your Honor. And I would commend you to pages 1306 to 1308 of the Joint Appendix for his testimony on that subject. All right. Thank you. The court will reserve decision.